## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAH LIQUIDATION CORP. (f/k/a/ FISKER | ) | Case No. 13-13087 (KG) |
| AUTOMOTIVE HOLDINGS, INC.), *et. al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| EMERALD CAPITAL ADVISORS CORP., AS | ) | |
| TRUSTEE FOR THE FAH LIQUIDATING | ) | |
| TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 16-51528 (KG) |
| | ) | |
| KARMA AUTOMOTIVE LLC AND | ) | |
| WANXIANG CLEAN ENERGY USA LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | **Re: D.I. 35** |

### OPINION

Emerald Capital Advisors Corp., as Trustee for the FAH Liquidating Trust (collectively, the "Trust") brings this action against Karma Automotive LLC ("Karma") and Wanxiang Clean Energy USA, LLC ("Wanxiang") (collectively, the "Defendants") challenging the issuance of additional securities to Wanxiang from Karma. In a five count complaint (the "Complaint"), the Trust claims that Defendants intentionally and improperly acted to dilute the Trust's common equity position in Karma to far less than the 20% the estate agreed to accept. Defendants now move to dismiss the Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7012 (the "Motion").[1]

### Facts

FAH Liquidating Corp. (f/k/a/ Fisker Automotive Holdings, Inc.) and FA Liquidating Corp. (collectively the "Debtors") were engaged in the business of designing, assembling and manufacturing plug-in hybrid electric vehicles. Compl. ¶ 10.  On November 22, 2013 (the "Petition Date"), the Debtors filed for relief under chapter 11 of the Bankruptcy Code. *Id.*  On or around the Petition Date, the Debtors requested the private sale of substantially all the Debtors' assets (the "Acquired Assets") to a senior secured lender, Hybrid Technology, LLC.  Compl. ¶ 11.  However, the official committee of unsecured creditors (the "Committee") requested that the Court order a public auction of the Acquired Assets, relying in large part on a representation made to the Committee by Wanxiang that it would submit a bid. Compl. ¶ 12.

With two stalking horse bidders, the Court granted the Committee's motion and the Debtors conducted a public auction (the "Auction") of the Acquired Assets from February 12, 2014, through February 14, 2014. Compl. ¶ 14.  At the conclusion of the Auction, the Debtors and the Committee jointly determined that Wanxiang had outbid Hybrid with a final bid of $149.2 million.  The Debtors then memorialized the bid in a purchase agreement (the "Purchase Agreement"). Compl. ¶ 14-15.  On February 19, 2014,

---

[1] Defendants previously moved to dismiss the Complaint pursuant to 12(b)(1), and in the alternative asked the Court to abstain under 28 U.S.C. § 1334(c)(1).  *See Emerald Capital Advisors Corp. v. Karma Automotive LLC*, 567 B.R. 464 (Bankr. D. Del. 2017).  The Court denied both motions. *Id.*

the Court entered an order approving the proposed sale of the Acquired Assets to Wanxiang, and the transaction closed on March 24, 2014. Compl. ¶ 16.

Pursuant to the Purchase Agreement, Wanxiang and Fisker Automotive Holdings, Inc. entered into an agreement creating Karma as a new entity (the "LLC Agreement").[2] Compl. ¶ 17. Under the LLC Agreement, Fisker Automotive Holdings, Inc. acquired a 20% equity interest in Karma while Wanxiang acquired the remaining 80%. Compl. ¶ 18-19. Wanxiang also retained the ability to appoint the members of Karma's Board of Managers, at which point they appointed Daniel Li, Pin Ni, and Pingyi Li. Compl. ¶ 20. All members of Karma's Board of Managers were affiliated with Wanxiang in some form. *Id.*

Section 3.3 of the LLC Agreement provided that if Karma wanted to raise additional capital they could permit Wanxiang to contribute such capital in exchange for Series A Preferred Units. Compl. ¶¶ 21-23. If Karma sought to issue Common Units under Section 9.3(a) of the LLC Agreement, they were required to notify other members of such an issuance so that any preemptive rights held could be invoked, and the members could have the opportunity to purchase their pro rata share of Common Units on the same terms. Compl. ¶¶ 22-23. Section 9.3(c) of the LLC Agreement did, however, permit Wanxiang to acquire units in a new offering without satisfying the pre-purchase notification requirements under Section 9.3(a), so long as notification and an opportunity

---

[2] Pursuant to Section 3.2 of the LLC Agreement, three separate classes of securities were created upon the formation of Karma: Common Units, Series A Preferred Units and Series B Preferred Units.

to acquire pro rata units were offered to the other members as soon as possible.  Compl. ¶¶ 23-24.  This pre-purchase notification was not required in the event of "timing constraints, confidentiality considerations, or other reasons." Compl. ¶ 24; LLC Agreement § 9.3(c).

On July 9, 2014, the Court approved the Debtors' Second Amended Chapter 11 Plan of Liquidation (the "Plan"). *In re FAH Liquidation Corp. (f/k/a/ Fisker Automotive Holdings, Inc.) et. al.*, No. 13-13087, D.I. 1059 (Bankr. D. Del. Filed Nov. 22, 2013).  Within the Plan, the Debtors incorporated the previously agreed to LLC Agreement, including the creation of the Trust and its equity position. Compl. ¶ 31; The Plan § 7.  Section 7(E) specifically states that "the [Trust] shall hold the equity position, subject to the terms and conditions set forth in the LLC Agreement, including with respect to Section 8.2(f) thereof…." *Id.*  Moreover, Section 7(D) of the Plan discusses tax treatment of the Trust, indicating that it will be classified as a liquidating trust under 26 C.F.R. § 301.7701-4. *Id.*

Following the approval of the Plan, Karma sent to the Trust a capital call notice on April 10, 2015 (the "Capital Call"), invoking Section 3.3 of the LLC Agreement and requesting that the Trust provide additional capital in order to maintain its 20% equity position.  Compl. ¶ 34.  Karma informed the Trust that it had agreed to issue additional Common Units to Wanxiang, and gave the Trust until April 30, 2015, to make its contribution. *Id.*  On April 30, 2015, the Trust informed Karma that the LLC Agreement only allows Karma to seek a capital contribution from the issuance of Series A Preferred Units, not Common Units, and therefore deemed the Capital Call to be a legal nullity. Compl. ¶ 35.  In response to Karma's alleged attempt to improperly dilute the Trust's

equity position, Karma and the Trust entered into a standstill agreement (the "Standstill Agreement") stating that Karma would not issue any Common Units until December 31, 2015, 120 days after a business plan for Karma was provided to the Trust or if either party provided a notice of termination. Compl. ¶ 36.  On August 26, 2016, Karma ended the Standstill Agreement by sending a notice of termination via letter. Compl. ¶ 37.

On September 6, 2016, Karma entered into an agreement with Wanxiang to issue both Series A Preferred Units and Common Units in exchange for further capital contributions (the "Capital Contribution Agreement"). Compl. ¶ 38.  The Capital Contribution Agreement purported to issue both Common Units and Series A Preferred Units to Wanxiang in exchange for prior capital considerations, current capital considerations and future capital considerations.  Compl. ¶ 39.  In support of the Capital Contribution Agreement, Karma obtained an opinion stating that the Capital Contribution Agreement was fair (the "Fairness Opinion"). Compl. ¶ 40.

On September 8, 2016, Defendants sent two letters (the "Preemptive Rights Letters") notifying the Trust of the issuance of both Series A Preferred Units and Common Units, explaining that pursuant to Section 9.3(c) of the LLC Agreement the Trust could purchase from Wanxiang a portion of the units issued in order to maintain its equity position of 20%. Compl. ¶¶ 41, 43.  On September 13, 2016, the Trust responded to the Preemptive Rights Letters reasserting that the LLC Agreement did not allow Karma to issue additional Common Units to Wanxiang, and that such an arrangement was a legal nullity. Compl. ¶ 46.  Furthermore, the Trust requested that it be afforded the opportunity to interview individuals involved in the Capital Contribution Agreement and that the

Trust be allowed to inspect Karma's facilities. *Id.* Karma denied the request and did not permit the Trust to interview any individuals or inspect any facilities. Compl. ¶ 47.

On October 7, 2016, Karma and Wanxiang sent another letter, substantially similar to the Preemptive Rights Letters, stating they had again issued Common Units and Series A Preferred Units to Wanxiang. Compl. ¶ 48. The Trust responded again that the LLC Agreement did not permit such an action and the issuance was a legal nullity. Compl. ¶ 49. On November 8, 2016, Karma and Wanxiang sent a third letter substantially similar to the September 8 and October 7 letters, explaining that Karma had again issued Common Units and Series A Preferred Units to Wanxiang. Compl. ¶ 50. All of the letters sent by Karma and Wanxiang referenced the Fairness Opinion for the position that the issuances were not in violation of the LLC Agreement pursuant to Section 9.3(c). *Id.*

The Trust alleges that each of these issuances to Wanxiang diminished the 20% equity position the Trust was promised in the LLC Agreement. Compl. ¶ 39.[3]

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b) arising under the Bankruptcy Code.

---

[3] At oral argument, the Court learned that Wanxiang now holds 4,400 Common Units. The Trust's interest has therefore been reduced to 4.35%. The Trust would need 920 Common Units to maintain its 20% interest.

## Legal Standard

Federal Rule of Civil Procedure 12(b)(6), made applicable by Bankruptcy Rule 7012(b), provides for dismissal if a complaint fails to state a claim upon which relief can be granted. Rule 12(b)(6) is associated with Federal Rule of Civil Procedure 8(a)(2), made applicable by Bankruptcy Rule 7008, which states that a complaint fails unless it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 285 (1986)). The *Twombly* standard is one of plausibility and not probability "[and] simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556. In analyzing a complaint, the court will determine if a plaintiff has "nudged [their] claims across the line from conceivable to plausible." *Id.* at 570.

The Supreme Court further addressed the Rule 8(a)(2) pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). Under *Iqbal*, the Supreme Court affirmed that the *Twombly* standard applies to all civil suits in federal courts and further identified that "a court must accept as true all of the allegations contained in the complaint," and "only a complaint that states a plausible claim for relief survives a

motion to dismiss." *Id.* at 678.  The Third Circuit in applying the *Iqbal* standard stated a two-part test:

> First, the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a [court] must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d. Cir. 2009).

With these principles in mind, the Court will proceed with its analysis of the Motion.

<u>Discussion</u>

At its core, the Trust alleges that both Karma and Wanxiang intentionally and improperly sought to dilute the Trust's equity position to a value less than 20%.  Through these actions, the Trust claims that Defendants breached their contractual duties, breached their fiduciary duties, breached the implied covenant of good faith and fair dealing and induced the Debtors to rely on Defendants' promises to the detriment of the Debtors and the Committee.  In response, Defendants have raised a number of defenses in support of the Motion.

**I.    Counts I and III - Declaratory Relief and Breach of Contract**

The crux of the Trust's allegations is that Defendants breached their contractual duties as prescribed by the LLC Agreement.  Particularly, the Trust alleges that Defendants violated Section 3.3 and Section 9.3 of the LLC Agreement, which provide in pertinent part:

Section 3.3    Additional Units

Subject to the provisions of Section 9.3, [Karma] may from time to time issue additional Units to such Persons as the Board of Managers shall determine, for such consideration as shall be determined by the Board of Managers.  The Board of Managers may admit to [Karma] as Members those Persons to whom such additional Units are issued.  Without limiting the foregoing, it is understood and agreed that [Karma] has the right to issue additional Series A Preferred Units to Wanxiang or its designees in exchange for additional Capital Contributions.  Notwithstanding the foregoing, in no event shall [Karma] issue any additional Series B Preferred Units following the date hereof.

***

Section 9.3    Limited Preemptive Rights

(a)    If after the date hereof the Board of Managers authorizes the issuance of any Common Units or Common Unit Equivalents, [Karma] shall notify each member who holds Common Units regarding such issuance, which notice shall describe in reasonable detail the purchase price, the payment terms, the period in which the preemptive rights under this Section 9.3 can be exercised and the number of such Common Units or Common Unit Equivalents that such Member is entitled to purchase (the "Preemptive Notice").  Subject to Section 9.3(b), each Member who holds Common Units (or any assignee) shall have the preemptive right (exercisable by giving notice to [Karma] within thirty business days after [Karma] gives such notice to the Member) to purchase up to such Member's pro rata share (determined based on such Member's pro-rata ownership of the outstanding Common Units of the Company on a fully-diluted basis taking into account the conversion or exercise of all Common Unit Equivalents then outstanding) of such Common Units or Common Unit Equivalents that are proposed to be issued, at the same price and otherwise on the same terms as set forth in the Preemptive Notice….

***

(c)    The Members hereby acknowledge and agree that [Karma], due to timing constraints, confidentiality considerations, or other reasons, may request that Wanxiang acquire Units or Unit Equivalents in a New Offering in advance of complying with the requirements of Section 9.3(a), and each Member consents to such issuance, provided that, as promptly as practicable thereafter, either (i) [Karma] complies with the requirements of Section 9.3(a) with respect thereto or (ii) Wanxiang offers the other Members the right to acquire from Wanxiang that number of

9

Units or Unit Equivalents that such Member would have been offered by [Karma] under <u>Section 9.3(a)</u>….

**A.  Section 3.3**

Turning to the specific language of the LLC Agreement, the parties disagree as to what specific units Karma could issue to Wanxiang under Section 3.3 of the LLC Agreement.

Arguing that Karma could only issue Series A Preferred Units, the Trust states that the second sentence of Section 3.3 specifically shows that the phrase "Persons" in the first sentence does not include an existing member such as Wanxiang.  More specifically, the second sentence of Section 3.3 states that the "Board of Managers may admit to [Karma] as Members those Persons to whom such additional Units are issued."  By asserting that the Board could bestow upon one who obtained additional units the status of a "Member," any existing members were not contemplated for that phrase.

Moreover, the Trust directs the Court to the omission of certain language in Section 3.3, specifically the sentence "[w]ithout limiting the foregoing, it is understood and agreed that [Karma] has the right to issue additional Series A Preferred Units to Wanxiang or its designees in exchange for additional Capital Contributions."  The Trust argues that since this is the first time Wanxiang is mentioned in Section 3.3, it is only entitled to receive those units which are denominated in that particular sentence.  While Series A Preferred Units are mentioned, a specific reference to Common Units is absent.  *See Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (applying the rule of *expression unius est exclusion alterius* to a

contract and noting that including certain terms while omitting others "speaks volumes"). The Trust contends that by omitting Common Units the parties did not intend to grant Karma the ability to issue additional Common Units to Wanxiang.

Conversely, Defendants argue that the words "Members," "Persons" and "Units" in Section 3.3 are to be interpreted strictly under their defined terms in Section 1.1 of the LLC Agreement. *Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 451 (D. Del. 2014) ("[the parties] are sophisticated parties that explicitly stipulated how the word…shall be interpreted."). The definitions included in the LLC Agreement are as follows:

Section 1.1     Certain Definitions

***

(ll)     "Member" means a Unit Holder that has been admitted to the Company as a Member in accordance with the provisions hereof.

***

(rr)     "Person" means any individual, partnership, corporation, limited liability company, joint venture, trust, estate, association or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

***

(llll)     "Unit" means (i) the limited liability company interest in [Karma] that are represented by Series A preferred Units, Series B preferred Units and Common Units, and (ii) any securities issued or issuable with respect thereto (including securities issued or issuable pursuant to a dividend, split, reclassification or like action, or pursuant to a merger or exchange, and including stock of any corporate successor of [Karma]).

From these defined terms, Defendants contend that the first sentence of Section 3.3 allows Karma to issue Common Units to Wanxiang. The first sentence again reads "[Karma] may from time to time issue additional *Units* to such *Persons* as the Board of

Managers shall determine…" (emphasis added).  Defendants urge the Court to use the broadly defined terms and interpret the first sentence simply to stand for the proposition that Karma can issue any unit, Common, Series A or otherwise, to Wanxiang and any other "Persons."  Furthermore, Defendants point to the remaining language in Section 3.3, specifically "without limiting the foregoing" when referencing Series A Preferred Units, and "notwithstanding the foregoing" when referencing Series B Preferred Units, to demonstrate that Section 3.3 contemplates various mechanisms for Karma to obtain equity or debt financing. *See All. Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 763 (Del. Ch. 2009) (interpreting "[w]ithout limiting the foregoing" to indicate that the phrase "does not limit the effect of the general proposition" appearing before it); *JANA Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 345 (Del. Ch. 2008) (substituting the phrase "notwithstanding the foregoing" for "despite any earlier indication to the contrary").  By beginning Section 3.3 with the broad provision that Karma can issue any units to all "Persons," then more specifically addressing the individuals that may or may not be able to receive Series A and Series B Preferred Units, Defendants claim the LLC Agreement is not ambiguous and clearly allows for the issuance of additional Common Units to Wanxiang.

Under Delaware law, in order to survive a breach of contract claim the plaintiff must allege three specific elements: (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  In analyzing the contract, any "clear and unambiguous language found in the contract is to be given its ordinary and usual

meaning." *Templeton v. EmCare, Inc.*, 868 F. Supp. 2d 333, 339 (D. Del. 2012) (quoting *Iacono v. Barici*, C.A. No. 02-021, 2006 WL 3844208, at *2 (Del. Super. Ct. Dec. 29, 2006)). An ambiguous term occurs "when the provisions in the controversy are reasonably or fairly susceptible [to] different interpretations." *VLIW Tech*, 840 A.2d at 615. If such an ambiguous term exists, a court "cannot choose between two differing reasonable interpretations" of such an ambiguous term at the motion to dismiss stage. *Id.* Dismissal of a complaint is only appropriate if the defendant's interpretation of the terms of the contract is the sole reasonable interpretation. *Id.* Thus, at this stage of the proceedings, the Court's exercise is to determine if Section 3.3 (and, as discussed below, Section 9.3) contain any ambiguous language.

At the outset, the Court looks to the specific language of the first sentence in Section 3.3. This provision establishing to whom Karma may issue units uses the words "Members," "Persons" and "Units" as defined terms. In their arguments, both parties urge the Court to read the contract "as a whole in order to determine its purpose and intent," and not to construe a single clause by taking it out of context. *USA Cable v. World Wrestling Fed'n Entm't, Inc.*, 2000 WL 875682, at *8 (Del. Ch. June 27, 2000). In reading the contract as a whole, the Court must assay any defined terms based upon the provided for definition in the contract in question. *See Mehiel v. Solo Cup Co.*, 2005 WL 5750634 (Del. Ch. May 13, 2005) (noting that a defined term and its meaning is expressly limited to the definition provided in the agreement); *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *3 n.11 (Del. Ch. Aug. 13, 1997) ("[i]t is an elementary canon of contract construction that the intent of the parties must be ascertained from the

langue of the contract." (quotation omitted)).    Section 1.1 of the LLC Agreement specifically defines "Member" as any holder of company units, "Person" as *any individual* and "Unit" as *any unit* available for issuance (emphasis added).  In viewing the phrase in Section 3.3 which states "[Karma] may from time to time issue additional Units to such Persons as the Board of Managers shall determine, for such consideration as shall be determined by the Board of Managers[,]" the Court must view that statement as meaning that Karma is able to issue *any additional unit* to *any person* for such consideration.  Had either party wanted a more specific reading of these terms, they would have included such language in the LLC Agreement. *See Mehiel*, 2005 WL 5750634 at *5 (explaining that had the plaintiff wanted a broader reading of a defined term, he should have contracted for it).  Using the defined terms of the contract that both parties agreed to, there can be no other reasonable interpretation inferred from that sentence.

The second sentence of Section 3.3 reads "[t]he Board of Managers may admit to [Karma] as Members those Persons to whom such additional Units are issued."  The Trust alleges that the specific phrase of admitting as "Members" certain "Persons" who acquire additional units suggests that the use of "Persons" throughout Section 3.3 refers to existing members.  The Court does not agree.  The specific language used states that the Board of Managers *may* admit to Karma "Persons" who acquire additional units.  Section 3.3 does not state that the Board *must* admit such "Persons."  Had the word *must* been used, there would have been no situation in which a "Person" acquiring additional units could have been a "Member," for they *must* have obtained such a status upon purchase. However, the use of the word *may* indicates that there are situations which could arise

14

where the Board of Managers would not admit certain "Persons" as "Members."  The current case yields such a situation.  Wanxiang, a "Person" as defined by the contract, was already a "Member."  Upon acquiring additional Units it would be impossible for the Board of Managers to make Wanxiang a "Member" because it already held "Member" status.  Accordingly, the second sentence cannot reasonably be read to limit the word "Person," an already defined term, to only existing members throughout Section 3.3.

The remainder of Section 3.3 reads:

Without limiting the foregoing, it is understood and agreed that [Karma] has the right to issue additional Series A preferred Units to Wanxiang or its designees in exchange for additional Capital Contributions. Notwithstanding the foregoing, in no event shall [Karma] issue any additional Series B Preferred Units following the date hereof.

Of particular importance in the Court's analysis is the phrase "without limiting the foregoing."  Both parties agree that this phrase does not limit the general proposition in the preceding sentence, but disagree on what that general proposition is.  However, since the Court has already found that the first sentence can only reasonably be read to state that Karma may issue any unit to Wanxiang, the statement that Karma has the right to issue Series A Preferred Units only serves to clarify the first sentence. *See All. Data Sys.*, 963 A.2d at 763 (explaining the phrase "[w]ithout limiting the foregoing" does not limit a general proposition, but may also not expand on any plain or limited meanings").  By using the phrase "without limiting the foregoing," the second sentence merely clarifies that within the broad right to issue any unit to any "Person," Karma can issue Series A Preferred Units to Wanxiang in exchange for capital contributions.

In the third sentence of Section 3.3 (which begins "without limiting the foregoing…"), the parties chose to indicate that Karma had the ability to issue additional Series A Preferred Units, but did not indicate that Karma could issue additional Common Units.  It is this omission of Common Units, the Trust claims, that demonstrates the parties did not contemplate Karma issuing any additional Common Units to Wanxiang at all. *Active Asset Recovery,* 1999 WL 743479, at *11.[4]

While the Trust properly cites *Active Asset* for its proposition, the rule of *expressio unis est exclusion alterius* ultimately works against the Trust's own argument.  *Active Asset* states that "explaining under the rule of *expressio unis est exclusion alterius,* '[i]f one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are not general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded.'"). *Id.* at *11 (quoting Arthur L. Corbin, 3 *Corbin on Contracts* § 552 at 206 (1960)). Visiting again the first sentence of Section 3.3, the parties used the word "Units" as it is defined in the LLC Agreement, but omitted other defined terms such as "Series A Preferred Units" and "Series B Preferred Units."  Under the *Active Asset* case analysis, the parties then intended to exclude Series A and Series B in the general portion of the provision.  As Defendants correctly argue, the third sentence is meant only to clarify, not

---

[4] It should be noted that unlike the case at hand, which is at the motion to dismiss stage of proceedings, *Active Asset* was a post-trial decision.  The court had the benefit of a more fully developed record when determining if the parties in that case agreed to a 100% recoupment of infrastructure costs attributable to certain media placements.  *Id.* at *9-11.  Here the Court is only determining if, based on the facts provided in the Complaint, the Trust provided enough factual information to establish that an ambiguity exists.

broaden or limit, the preceding sentences of Section 3.3.  Therefore, any omission of Common Units in the third sentence does not indicate the parties' intentions, for they already included "Units" (the general word) in the first sentence to show Common Units, Series A Preferred Units and Series B Preferred Units (the other subjects).

Subject to Section 9.3, The Defendants' reading of Section 3.3 of the LLC Agreement is the only reasonable interpretation and Section 3.3 contains no ambiguous language.  The LLC Agreement therefore permitted Karma to issue Common Units to Wanxiang in exchange for a capital contribution.

### B.  Section 9.3

The Court's interpretation of Section 3.3 does not, however, complete the analysis of Counts I and III of the Complaint.  The very first phrase in Section 3.3 states "[s]ubject to the provisions of Section 9.3…."  Thus, any actions permitted by Section 3.3 must also satisfy the requirements of Section 9.3.

Section 9.3(a) generally describes the parties' expectations and requirements regarding any preemptive rights that may arise from the issuance of additional Common Units.  Should Karma choose to issue any Common Units per the authorization of the Board of Managers, Karma is required to notify each Member who holds Common Units so that they may have the opportunity to also purchase additional Common Units (up to their pro rata share).  The purpose of Section 9.3(a) is to maintain the *status quo,* if possible.  Notice is to be sent prior to the issuance of Common Units, and requires a detailed description of the purchase price, the payment terms, the time in which the preemptive

right can be exercised and the number of Common Units that each Member can purchase.

There is no controversy over Section 9.3(a).

The parties do, however, argue about the meaning of Section 9.3(c), which reads

in full:

> (c)   The Members hereby acknowledge and agree that [Karma], due to timing constraints, confidentiality considerations, or other reasons, may request that Wanxiang acquire Units or Unit Equivalents in a New Offering in advance of complying with the requirements of <u>Section 9.3(a)</u>, and each Member consents to such issuance, provided that, as promptly as practicable thereafter, either (i) [Karma] complies with the requirements of <u>Section 9.3(a)</u> with respect thereto or (ii) Wanxiang offers the other Members the right to acquire from Wanxiang that number of Units or Unit Equivalents that such Member would have been offered by [Karma] under <u>Section 9.3(a)</u>.

The salient issue in Section 9.3(c) is whether the phrase "or other reasons" permits

Karma to forego the preemptive right requirement under Section 9.3(a) and issue

additional Common Units without notification for any reason.  Defendants allege, as

stated in their brief, that "[Karma} can forego the notice required by Section 9.3(a) for

'other reasons'…[t]here is no limitation of any kind in the contract on what those 'other

reasons' may be."   Def.Br. Pg. 9 (Adv. D.I. 36).   A ruling in favor of Defendants'

interpretation of Section 9.3(c) would allow Karma to forego notice for each and every

issuance so long as there was "some reason."

In construing words of a contract, "the Court may not detach 'general words from

accompanying expressions of an explanatory character, and often times as in this case, a

broad phrase must be construed as *ejusdem generis*.'" *In re Joan Fabrics Corp.*, 508 B.R. 881,

887 (Bankr. D. Del. 2014) (quoting *Cleveland Trust Co. v. Consol. Gas, Elec. Light & Power*

*Co. of Baltimore*, 55 F.2d 211, 215 (4th Cir. 1932)).  The well-established rule of *ejusdem generis* states "where general language follows enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the general kind or class as those specifically mentioned."  *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004).  "Several courts have also stated that [*ejusdem generis*] is particularly applicable where the specific enumeration precedes the word 'other,' followed by general words." *In re Joan Fabrics Corp.*, 508 B.R. at 887; *See also United States v. Sec. Mgmt. Co., Inc.*, 96 F.3d 260, 266 n. 7 (7th Cir. 1996) (same); *United States v. Brown*, 536 F.2d 117, 122 (6th Cir. 1976) (same); *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 293 (3d Cir. 2013) (same).

In the LLC Agreement the specific enumerations "timing constraint" and "confidentiality considerations" are immediately followed by the general phrase "other reasons."  Because it is preceded by words of particular and specific meaning, the phrase "other reasons" is limited only to those events relating to timing constraints or confidentiality considerations.

The Court must look to the facts pled in the Complaint to determine if the Trust made factual allegations that Defendants not only failed to notify the other Members, but had no timing constraints or confidentiality considerations when they failed to provide notice to the Trust before issuing Common Units to Wanxiang.  The Trust alleges in the Complaint that on September 6, 2016, October 7, 2016, and November 8, 2016, Karma violated Section 9.3 by issuing additional Units to Wanxiang without first providing

notice to any other Members.  Furthermore, the Trust specifically mentions that "there is no mention of 'timing constraints' or 'confidentiality considerations' as specifically required by Section 9.3(c) of the LLC Agreement in the Preemptive Rights Letters." Compl. ¶ 43.  The Trust properly alleged a violation of Section 9.3(c).

Defendants contend that even accepting the premise that Section 9.3(c) does not permit an issuance of Common Units without notice, the issuance was proper because Karma did provide notice to the Trust for the Capital Call on April 10, 2015.  On that date, Karma notified the Trust that it had agreed to issue additional Common Units to Wanxiang and gave the Trust an opportunity to exercise its rights under the LLC Agreement.  The Trust responded that Karma was not permitted to issue the Common Units under the LLC Agreement.  The disagreement led to the execution of the Standstill Agreement on August 17, 2015.  It is that April 10 notice, Defendants argue, that satisfies their requirement under Section 9.3(a) by notifying the Trust that Karma planned to issue additional Common Units to Wanxiang.  Defendants claim that "[Karma] had already delayed the issuance of Common Units to Wanxiang by nearly 18 months, and the Trust had already indicated not only that it had no intention of participation in the capital contributions, but also that it would seek to have them declared a 'legal nullity'". Def. Reply. Br., Pg. 9 (Adv. D.I. 39) (emphasis omitted).

Looking again to the LLC Agreement, Section 9.3(a) provides that when Karma notifies any Members regarding further issuance of Common Units, they must do so with specificity and "describe in reasonable detail the purchase price, the payment terms, the period in which the preemptive rights under this Section 9.3 can be exercised and the

number of such Common Units or Common Unit Equivalents that such member is entitled to purchase []." The specificity of any potential issuance is essential.

While Defendants are correct that they provided specific information regarding the Capital Call, the parties present no facts that demonstrate the September 6, 2015, issuance was identical to the Capital Call. Without that information, under the 12(b)(6) standard, the Court must view the facts in the light most favorable to the Trust and assume that the issuance on September 6, 2015, and the Capital Call were dissimilar.[5] Applying this assumption, the Capital Call would not have satisfied the specificity requirement under Section 9.3(a) of the LLC Agreement and Karma would not have provided proper notice. Similarly, the parties presented no facts about the particulars of the October 7, 2016, and November 8, 2016, issuances of Common Units.

The factual allegations which the Court accepts as true, combined with the Court's finding that *ejusdem generis* limits the "other reasons" wording in Section 9.3(c), are sufficient to show that the Trust has properly alleged for the purposes of Rule 12(b)(6) that Defendants breached Section 9.3 of the LLC Agreement. Since the Court is sustaining the Complaint on the alleged breach of Section 9.3, and Section 3.3 is subject to Section 9.3, the Trust has properly alleged that Defendants also breached Section 3.3.

---

[5] While the Court understands it is not permitted to assume facts not alleged, the task at this stage is to determine if it is plausible that discovery would reveal evidence of a dissimilar price, payment term, etc. *See Twombly*, 550 U.S. at 555. Based upon the complex nature of the case and sophistication of the parties, a dissimilarity is plausible and could be established by further discovery.

### C. Damages

The Trust must also present facts that it sustained damage from the breach to satisfy a breach of contract claim. *VLIW Tech.*, 840 A.2d at 612.   A complaint cannot survive a motion to dismiss where a plaintiff fails to plead facts that support a crucial element of the claim. *See, e.g.*, *In re OSC 1 Liquidating Corp.*, 529 B.R. 825, 832 (Bankr. D. Del. 2015).   Plaintiffs are not, however, required to allege damages with exact specificity. *See, e.g.*, *Weyerhaeuser Co. v. Domtar Corp.*, 61 F.Supp.3d 445, 453 (D. Del. 2014) (finding that the plaintiff was not required to allege an exact monetary figure in order to sufficiently plead damages in a breach of contract claim).

The Trust alleges that by violating the LLC Agreement, Defendants did not enable the Trust to exercise its preemptive rights.  The inability to exercise the preemptive rights led to Karma issuing units only to Wanxiang, thus diluting the Trust's equity position from 20% to just over 4%.  Accordingly, the Complaint does set forth facts that allege the Trust suffered damages resulting from Defendants' breach of the LLC Agreement.[6]  The Trust has properly alleged damages.

---

[6] The gravamen of the Complaint is based upon the Trust's belief that its equity position has been reduced by the additional issuances of units to Wanxiang.  While the precise amount of damages may not be stated, it is not necessary to state a specific amount at this stage of the proceeding. *Weyerhaeuser*, 61 F. Supp. 3d at 543.  Furthermore, the Trust does allege in the Complaint that as a result of the Capital Contribution Agreement its equity position was lowered to 4%, a quantifiably lower percentage than the 20% they first obtained.

## II.  Count II - Breach of Fiduciary Duty

Delaware law provides that "'in the absence of a contrary provision in the LLC agreement,' LLC managers and members owe 'traditional fiduciary duties of loyalty and care' to each other and to the company." *Kelly v. Blum*, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) (quoting *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 n.33 (Del. Ch. Apr. 20, 2009)).  When evaluating a plaintiff's fiduciary duty claim, the business judgment rule generally applies, and the presumption of its applicability places an initial burden of proof on the plaintiff. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1165, 1161-62 (Del. 1995).  If, however, a plaintiff demonstrates that the defendants were self-interested in the transaction in question, the entire fairness standard applies, and the burden shifts to the self-interested party. *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).  A self-interested allegation is fact-intensive, and the mere "fact that the entire fairness standard applies normally will preclude dismissal of a complaint on a 12(b)(6) motion to dismiss" if the plaintiff properly alleges such facts. *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 589 (Del. Ch. 2015).

The Trust alleges that Wanxiang engaged in a self-interested transaction through the Capital Contribution Agreement with Karma, and by doing so violated its duty of loyalty, care and good faith. The transaction was purportedly self-interested because all of Karma's Board members are affiliated with Wanxiang in some capacity, the Board approved the Capital Contribution Agreement and only Defendants benefitted from the transaction.  Furthermore, the Trust claims that Defendants stripped the Trust of its assignment and preemptive rights.  Based upon its status under Treasury Regulation

Section 301.7701-4(d)[7], the Trust was only permitted to assign its preemptive rights, it had no right to execute those rights on its own.   Prior to the execution of the Capital Contribution Agreement, Karma informed the Trust that the Trust could not assign its preemptive rights to any third party without the prior consent of Defendants.   The Trust alleges that Defendants knew it was unable to assign its rights and intentionally added this provision into the Capital Contribution Agreement so that only Defendants could participate.[8]

The Trust has set forth allegations of a self-interested transaction. The Complaint contends that the Board was made up entirely of Wanxiang affiliated persons. Compl. ¶¶ 19, 38.  With Wanxiang standing on both sides of the transaction, the Trust claims that Defendants knowingly stripped the Trust of its ability to assign its preemptive rights by conditioning any assignment of such rights on the consent of Defendants. Compl. ¶ 45. As such, if the Board did approve such an agreement with the knowledge that the Trust could not participate without Karma's permission, the transaction would be self-interested and a violation of the duty of loyalty.  Such a transaction, under Delaware law,

---

[7] Section 301.7701-4(d) explains that a liquidating trust is an organization created for the "primary purpose of liquidating and distributing the assets transferred to it...."  If, however, a liquidating trust demonstrates a purpose of carrying on a profit-making business, it no longer enjoys the designation of liquidating trust.  Furthermore, voting trusts and committees formed during insolvency or bankruptcy are analogous to liquidating trusts.  They too will lose their designation under Section 301.7701-4(d) if used to further the control or profitable operation of an ongoing business.

[8] Section 7(D) of the Plan, a document Defendants had knowledge of, discusses that Section 301.7701-4(d) applies to the Trust.  Seeing as Defendants had knowledge of the document, their knowledge of the Trusts' tax status is inferred.

must be analyzed under the entire fairness standard, with the burden shifting to Defendants to show that facts are not well-pled to support a self-interested transaction.

In response, Defendants argue that because the Trust was given the opportunity to receive Common Units at the same price as Wanxiang under the Capital Call Agreement, the benefit was made to all shareholders on equal footing. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721-22 (Del. 1971) (stating that if there is a benefit that is made available to all shareholders on equal terms, there is no "self-dealing" and the business judgment rule should apply). Defendants further state that even if the Trust could not participate, *Sinclair Oil* would still apply according to *Williams v. 5300 Columbia Pike Corp.*, 901 F. Supp. 208, 211-12 (E.D. Va. 2005) (applying Delaware law).

*Williams*, however, is not entirely analogous. In *Williams*, plaintiff shareholders argued that a company's board of directors deliberately set an offering at an inadequately low price, triggering anti-dilution provisions that created a possibility that shareholders would not be able to participate in the offering. *See id.* The key analysis by the *Williams* court that dismissed the case was that the directors were aware of a *possibility* that some shareholders would be unable to take part in the offering. *Id.* The court in *Williams* stated that "[the] knowledge of a *possibility* [of being unable to participate] is insufficient to establish that the directors acted fraudulently or that their interests were in conflict with any of the shareholders for the purpose of shifting the burden of proof." *Id.* at 211-12 (emphasis in original). The court's emphasis on the word "possibility" is instructive. In our case, the Trust alleges that the Defendants *knew* they would exclude the Trust from the issuance, not merely that there was a *possibility* they may be excluded. If true, not all

25

members were on equal footing because the Trust could not participate, and so the entire fairness standard still applies.

The entire fairness standard has "two basic aspects: fair dealing and fair price." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). "The fact that the entire fairness standard applies 'normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss.' But, '[e]ven in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair.'" *Calma on Behalf of Citrix Systems, Inc. v. Templeton*, 114 A.3d 563, 589 (Del. Ch. 2015) (quoting *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996)).

Regarding unfair dealing, the Trust alleges that Defendants engaged in an unfair process when Karma issued additional Units to Wanxiang knowing the Trust would not be able to participate. As a self-interested transaction, this satisfies unfair dealing. As to unfair price, the Complaint is devoid of any factual allegations that the price Wanxiang paid to Karma was unfair. However, while the price is unknown the Fairness Opinion creates a factual issue. The Trust cites *In re Green Field Energy Servs.*, No 13-12783 (KG), 2015 WL 5146161, at *14 (Bankr. D. Del. Aug. 31, 2015) for the proposition that whether or not the price was fair is a factual issue, and the Trust was not obligated to make an argument in response to a 12(b)(6) motion.[9]

---

[9] While the court in *Green Field Energy* did state that unfair price was a factual issue not to be decided at the 12(b)(6) stage of that proceeding, it immediately qualified that statement by explaining "the [plaintiff] must do more than baldly assert insolvency, but certainly something short of a detailed financial analysis will suffice." *Green Field Energy*, 2015 WL 5146161, at *14. So

The Trust also states that the Defendants' actions were so egregious that the Complaint need not allege any facts demonstrating an unfair price. *See In re Nine Sys. Corp. S'holders Litig.*, No. 3940-VCN, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014) (stating that even a fair price "does not ameliorate a process that was beyond unfair"). In *Nine Sys. Corp.*, the plaintiffs alleged that several defendants increased their equity while diluting the plaintiffs' equity, ultimately leading to a request for $130 million in damages. *Id.* Ruling that the entire fairness standard applied, the court looked to the actions of the defendants with regard to fair dealing and fair price, ultimately finding that "even if [the transaction] was conducted at a fair price, [it] was [not] an entirely fair transaction because of the grossly inadequate process employed by the [d]efendants." *Id.* at *38-47. In reaching this conclusion, the court noted that while "a grossly unfair process can render an otherwise fair price…not entirely fair[,]" it would not be "unprecedented for [the] [c]ourt to conclude that a price near the low end of a range of fairness, *coupled with an unfair process*, was not entirely fair." *Id.* at 47 (emphasis added). In essence, even though price was fair and dealing was not, an issue existed.

Here, the Trust does set forth facts that are applicable under *Nine Sys. Corp.* Specifically, the Trust states that the Fairness Opinion issued provided no meaningful analysis to the fairness of the September 6, 2016, issuance. Furthermore, the Fairness Opinion allegedly only applies to the September 6, 2016, issuance, but is referenced in

---

while details are not required, the plaintiff must establish some base through some factual allegation that an unfair price exists. A court may accept facts as true on a 12(b)(6) motion, but those facts must be well-pled. *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *8 (Del. Ch. Jan. 14, 2010).

both the October 7, 2016, and November 8, 2016, issuances as well.  Producing a fairness opinion that does not provide any substantive fairness analysis, and then using that same opinion on two separate issuances when by its own definition it is limited to a single issuance are facts that, under *Nine Sys. Corp.*, render the process unfair.  Thus, the alleged misuse of the Fairness Opinion creates a factual issue as to whether the transaction was, in fact, truly fair.

The Trust has alleged that the entire fairness standard applies and that the self-interested transactions amount to unfair dealing by Defendants.  Under the circumstances, that is sufficient to defeat a motion to dismiss.

## III.    Count IV – Breach of the Implied Covenant of Good Faith and Fair Dealing

The doctrine of the implied covenant of good faith and fair dealing is "best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).  While the implied covenant of good faith and fair dealing attaches to every contract, a party "cannot base a claim for breach [] on conduct authorized by the terms of the agreement." *Id.*  If such actions are addressed in the contract at issue, the implied covenant of good faith and fair dealing does not apply. *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015).

Both parties agree that the LLC Agreement and the Plan control, and that any conduct specifically addressed in those documents is not actionable under the implied covenant.  The Trust, however, claims that Defendants violated the implied covenant

when they requested that the Trust make a series of false representations and required the Trust to seek Defendants' approval before assigning its preemptive rights.  By taking these actions, Defendants are alleged to have deprived the Trust of its ability to exercise its bargained-for preemptive rights, which resulted in the reduction of the Trust's equity position.

Defendants argue that the Court should dismiss Count IV because the issuance of Common Units was permitted by the LLC Agreement.  While true, Defendants misstate the Trust's allegations.  The physical issuance of Common Units is not the issue in this claim, but rather the restriction of the Trust's preemptive rights.

In analyzing the facts presented at this stage of the proceedings, it appears the Trust valued the equity as important in its bargain, and that Wanxiang was aware of the importance.[10]  With both parties understanding that the bargained for equity position carried weight during the negotiations, any actions not laid out by the LLC Agreement that would alter the Trust's equity expectation would in fact be a violation of the implied covenant.  Such a situation is alleged in this case.

Section 9.3 of the LLC Agreement (which addresses preemptive rights) contains no provision or wording that indicates Defendants may, or may not, require the Trust to first seek Defendants' approval before assigning its rights.  Nevertheless, Defendants demanded such approval.  The result of this demand, as claimed, robbed the Trust of its

---

[10] In the Complaint, the Trust states that during the auction process a crucial piece of the final bid proposal was the Trust's 20% equity position, and the assumption that this equity position would remain through the year 2017. Compl. ¶ 14-15.

ability to assign its preemptive rights.  This ultimately resulted in a depletion of the Trust's equity to one-fifth of the original amount.  Since maintaining this equity was an inferred contractual term, not one specifically laid out in the LLC Agreement, the Trust has properly stated a claim for breach of the implied covenant of good faith and fair dealing.

## IV.    Count V – Promissory Estoppel

"The doctrine of promissory estoppel is an equitable remedy 'designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement.'" *Weiss v. Northwest Broadcasting, Inc.*, 140 F. Supp. 2d 336, 344-45 (D. Del. 2016) (quoting *Feinberg v. Saunders, Karp & Megrue, L.P.*, No. 97-207-SLR, 1998 WL 863284, at *17 (D. Del. Nov. 13, 1998)).  That is, promissory estoppel acts as a "consideration substitute for promises which are reasonably relied upon, but which would otherwise not be enforceable." *Weiss*, 140 F.Supp.2d at 445.  Any claim of promissory estoppel may only be brought "when there is doubt surrounding the enforceability or the existence of the contract." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012).

The Trust pleads in the alternative that there was reasonable reliance on Wanxiang's promise that its bid for the Debtor included the 20% equity for the benefit of the Trust.  While the Trust received the equity, Wanxiang's actions indicate that the 20% interest was, in Wanxiang's thinking, illusory.  While it is true that a party cannot assert a claim for promissory estoppel when there is an enforceable contract between the parties, the Court will not dismiss the Trust's alternative claim of promissory estoppel at this

stage of the proceedings.  Although the Court has largely sustained the Complaint, doubt remains on the enforceability of the LLC Agreement and the promissory estoppel claim may turn out to give substance to the Complaint.  It does appear from the facts alleged in the Complaint that Wanxiang may have eviscerated a promise that the Trust would own 20% of Karma through 2017.  Promissory Estoppel, plead in the alternative, may be the Trust's saving claim and the Court will not dismiss the claim.

## Conclusion

For the foregoing reasons, the Court concludes that under Section 3.3 of the LLC Agreement, Karma is permitted to issue Common Units to Wanxiang in exchange for capital contributions, but that the Trust has properly alleged that Defendants' actions constitute a breach of contract under Section 9.3.  The Court also concludes that based upon the self-interested nature of the transaction, the entire fairness applies and the Trust has properly alleged a breach of fiduciary duty under that standard.  The Court also concludes that the Trust has properly alleged a breach of the implied covenant of good faith and fair dealing, and in the alternative facts to support a claim for promissory estoppel.

Defendants' Motion is DENIED.  The Court will issue an order giving effect to its ruling.

Dated:  December 4, 2017

_____
KEVIN GROSS, U.S.B.J.